UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

DAVID CAREY,                                    **DECISION AND ORDER**

         Petitioner,

    v.                                          6:20-CV-06477 EAW

SUPERINTENDENT, WASHINGTON
CORRECTIONAL FACILITY,

        Respondent.

———————————————————

## I.  INTRODUCTION

David Carey ("Petitioner") has filed a counseled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is being unconstitutionally detained by the Superintendent of Washington Correctional Facility ("Respondent").  (Dkt. 1).  Petitioner is in custody pursuant to a judgment entered against him on March 2, 2016, in the Erie County Court, located in Buffalo, New York.  (*Id.* at 1).[1]  Following a jury verdict convicting him of second-degree criminal possession of a controlled substance, Petitioner was sentenced to a determinate term of 12 years to be followed by five years of post-release supervision.  (*Id.*).  He is currently serving that sentence.

In his timely filed petition, Petitioner contends that his custody is unconstitutional because:  (1) appellate counsel was ineffective in failing to argue that the adverse

---

[1]    Unless otherwise noted, citations to page numbers are to the pagination automatically generated by the Court's ECM/ECF system and located in the header of each page.

suppression ruling on the issue of standing deprived Petitioner of the effective assistance of counsel at a critical stage (Dkt. 1 at 5 (Ground One)); (2) the missing witness charge was erroneous as a matter of state law, shifted the burden of proof, and violated Petitioner's due process right to a fair trial (Dkt. 1 at 7 (Ground Two)); (3) appellate counsel was deficient for failing to argue that defense counsel was ineffective for (i) not objecting to prejudicial references to Petitioner's supposed gang affiliation, and (ii) not requesting a hearing to challenge the voluntariness of his alleged statements to police (Dkt. 1 at 8 (Ground Three)); and (4) defense counsel was ineffective in failing to move to dismiss the indictment on state statutory speedy trial grounds and failing to challenge the chain of custody of the drugs (Dkt. 1 at 10 (Ground Four)).

Respondent responded to the petition (Dkt. 4 (Response), Dkt. 5 (Memorandum of Law)) and manually filed the state court records and transcripts.  In reply, Petitioner filed a Declaration in Support and Traverse.  (Dkt. 6).  For the reasons discussed below, the Court finds that Petitioner has not shown he is entitled to habeas relief.  Therefore, the Court denies the request for a writ of habeas corpus and dismisses the petition.

## II.    BACKGROUND

### A. Pre-Trial Proceedings

Petitioner was charged under Erie County Indictment No. 00963-2013 with one count of Criminal Possession of a Controlled Substance in the Second Degree (New York Penal Law § 220.18(1)).  The indictment, *see* Respondent's Exhibit ("Resp't Ex.") A,[2]

---

[2]     Respondent's Exhibit A consists of the original transcripts from the criminal proceeding and the original documents from the prosecution's case file, including the pre-

alleged that on May 22, 2013, at 448 Amherst Street in the City of Buffalo, Petitioner knowingly possessed a quantity of cocaine having an aggregate weight of four ounces or more.

Retained counsel Jeremy Schwartz, Esq. moved to suppress the cocaine as the product of an unreasonable search and seizure.  Erie County Court Judge Kenneth F. Case (the "trial court") conducted a hearing on March 20, 2014.  Parole Officer Christopher Mack ("P.O. Mack"), Petitioner's parole officer, testified for the prosecution; the defense presented no witnesses.  After receiving briefing from the parties, the trial court issued a written decision and order denying the motion to suppress.  (*See* 9/03/14 Order Denying Suppression, Resp't Ex. A; *see also* 3/20/14 Transcript, Resp't Ex. A).

Finding that the record lacked any compelling evidence to show Petitioner was an overnight guest at 448 Amherst Street, the trial court rejected his standing argument.  (*Id.* at 5-6).  The trial court further agreed with the prosecution that, as an absconder from parole, Petitioner essentially was an escaped prisoner and, as such, lacked standing to challenge the search and seizure.  (*Id.* at 6-7).  The trial court held that even assuming Petitioner had established his status as an overnight guest, he did not demonstrate the search was unreasonable.  *Id.* at 7.  Rather, the trial court found, the parole officers lawfully entered 448 Amherst because they had a warrant to arrest Petitioner for having violated several of his parole conditions.  *Id.*  The trial court noted that, as part of his parole agreement,

judgment pleadings and trial court decisions.  The briefs and decisions regarding Petitioner's direct appeal, motion to vacate the judgment, and application for a writ of error *coram nobis* have been manually filed as Respondent's Exhibits B through E in a separately bound appendix.

Petitioner authorized his parole officer to search and inspect his property and residence. *Id.* Thus, even if he had not violated his parole terms and absconded, the parole officers still would have been able to search 448 Amherst Street, if that was in fact Petitioner's residence. *Id.* The trial court further found that the search was "rationally and reasonably related" to the parole officers' performance of their duties to detect and prevent parole violations. *Id.* Thus, whether or not Petitioner was an overnight guest at 448 Amherst Street, the cocaine was not seized in violation of his Fourth Amendment rights. *Id.* at 8.

### B. The Trial[3]

#### 1. Summary of Relevant Testimony

Landlord Randy Fortner testified that he rented the unfurnished rear apartment at 448 Amherst Street in Buffalo, New York, to a woman named Tijuana Evans ("Evans") on May 15, 2013. (T: 457-58).[4] Prior to finalizing the lease agreement, Fortner and Evans did a walk-through of the apartment, which was empty. (T: 458). Fortner provided Evans with one copy of the key to the apartment's only entry door. (*Id.*).

In May of 2013, P.O. Mack and his partner, P.O. Higgins were looking for Petitioner, who was P.O. Mack's parolee. P.O. Mack had a warrant for Petitioner's arrest because he had violated his parole conditions by, among other things, moving all his belongings out of

---

[3]     Prior to trial, Petitioner discharged Mr. Schwartz and retained Molly Musarra, Esq., as his new attorney.

[4]     Numerals in parentheses preceded by "T:" refer to pages from the trial transcript, manually filed as part of Respondent's Exhibit A.

his approved residence at 195 Colvin Street without prior approval.  (T: 465-67, 474, 528).[5]
At about 7:50 a.m. on May 22, 2013, P.O. Mack and P.O. Higgins went to 448 Amherst
Street.  (T: 468-69, 691-92).  The parole officers had verified through a utilities check that
the utilities at 448 Amherst were in Evans's name.  (T: 696-97).  P.O. Mack testified that
Evans was a known associate of Petitioner's.  (T: 474-75, 522).

A short while after they arrived at 448 Amherst, P.O. Mack and P.O. Higgins
observed a white Jeep pull up in front of the building.  (T: 469-70, 692).  A woman whom
P.O. Mack believed to be Evans got out and went to the rear apartment's entry door (T:
470), located on the side of the building (T: 458).  Evans was not carrying anything.  (T:
470-71).  She first knocked on the door and then tried to look through a window.  (T: 470).
She did this several times before someone let her in.  (T: 471, 497-98, 692, 699).  P.O. Mack
and P.O. Higgins were unable to see who opened the door for her.  (T: 498).

By around 8:40 a.m., officers from the Buffalo Police Department ("BPD") had
arrived in response to P.O. Mack's request for assistance.  (T: 471).  P.O. Mack, P.O.
Higgins, and BPD Officer Thomas Cino ("Officer Cino") went to the side door and
knocked.  (T: 472).  There was no response so P.O. Mack and the other officers continued
knocking for some time.  (T: 472-73, 700-01, 720).  Eventually, P.O. Mack lifted the screen
off one of the windows they had seen the woman looking through earlier; at that moment,
the woman answered the door.  (T: 473-74, 500, 539).  P.O. Mack confirmed to himself that

---

[5]     Numbers in parentheses preceded by "T:" refer to pages of the trial transcript, filed
manually as part of Respondent's Exhibit A.

the woman was Evans, whom he had met previously during a home visit for Petitioner at 195 Colvin.  (T: 474-75, 522).

Upon opening the door, Evans asked why the officers were there; P.O. Mack responded by asking her where "David Carey" or "Mike", Petitioner's nickname, was.  (T: 477).  P.O. Higgins testified that at one point Evans attempted to shut the door on them so he put his hand on the door.  (T: 701).  After some back and forth with the officers, Evans motioned that Petitioner was inside by pointing upwards towards the second floor.  (T: 477, 701, 720).  However, Evans would not move so P.O. Mack pulled her out of the doorway and positioned her to the side of the building.  (T: 477).  P.O. Higgins and Officer Cino went into the apartment first and proceeded upstairs; P.O. Mack followed them.  (T: 477, 721).

Meanwhile, BPD Officer Joseph Donovan ("Officer Donovan"), who was stationed outside 448 Amherst, watched a black male remove the window screen from a second-story window, climb out of the window, hang from the sill, and drop 15 or 20 feet down to the concrete pad below.  (T: 565, 567-68).  The man was wearing only a t-shirt, underwear or shorts, and socks.  (T: 568).  Officer Donovan held the man at gunpoint and his partner arrested him.  (T: 568-69).  P.O. Mack confirmed that the suspect in custody was Petitioner and returned inside the apartment.  (T: 478).

Officer Donovan and his partner transported Petitioner to the emergency room because he was complaining of uncontrollable pain in his feet.  (T: 569).  While Petitioner was receiving treatment, Petitioner "said [']I am going to take the rap for all of this,['] he doesn't want Tijuana to get locked up."  (T: 574).  Petitioner and Officer Donovan were not

- 6 -

having a conversation at the time, and the statement was not in response to anything that Officer Donovan or his partner had said.  (T: 574-75).  Petitioner was not handcuffed.  (T: 574).  Officer Donovan testified that he never mentioned to Petitioner whether anything had been recovered from 448 Amherst, and while they were still at 448 Amherst, Petitioner was not shown anything by the officers.  (T: 575).

In the meantime, back at 448 Amherst, P.O. Higgins and Officer Cino were conducting a protective security sweep.  (T: 478, 703-04).  The officers found no other individuals upstairs, which was devoid of furniture, female clothing, or female toiletries.  (T: 479-80, 533, 722).  In the living room on the first floor, P.O. Higgins and Officer Cino observed a bed and several articles of men's clothing and pairs of men's shoes.  (T: 480-81, 539-40, 723-24).  P.O. Mack also found one key to the apartment lying on the bed, as well as a wallet with Petitioner's New York State I.D. card and other forms of identification.  (T: 482-83).

P.O. Higgins testified that as part of the security sweep, he lifted the whole bed up by the rail so Officer Cino could have a safer vantage point to look underneath it.  (T: 705).  P.O. Higgins saw a cardboard box right at his feet as soon as he raised the bed.  (T: 705).  He testified that the box could have been seen by someone standing away from the bed.  (T: 726).  Inside the box was a plastic shopping bag, and inside that was what appeared to P.O. Higgins to be a clear plastic bag containing cocaine.  (T: 706).  Since P.O. Higgins was still holding the bed up, Officer Cino recovered the box.  (T: 706, 725).  P.O. Higgins testified that neither he nor any other officer at the scene touched anything inside the box, and that only Officer Cino touched the box (not the contents).  (T: 726-28).  P.O. Mack testified that

when he came into the living room, P.O. Higgins pointed out the box to him, which was in plain view and contained what appeared to P.O. Mack to be cocaine.  (T: 481-82).

Officer Cino testified that the open box was situated alongside the bed, with a very small part of the box under the bed.  (T: 540).  He similarly testified that he could see a substance that appeared to be cocaine wrapped in plastic wrap inside the box.  (T: 540).  He was responsible for taking custody of the box and submitting its contents to the laboratory at Central Police Services ("CPS") for forensic testing.  (T: 542).  To prepare the box's contents for submission, he donned gloves and removed the suspected bags of cocaine from the outer plastic wrapping.  (T: 544).  He placed them in an envelope, sealed it with tape, initialed and dated the tape, and placed the envelope into a self-securing locker that cannot be reopened after something is deposited in it.  (T: 543-44).  No one else touched the cocaine.  (T: 544).  During the time that Officer Cino had possession of the cocaine, he did not alter or modify it; nor did anyone else.  (T: 544).  He discarded the box and the plastic bag because they were not contraband.  (T: 557).  Officer Cino testified that the drugs, envelope, and sealant tape he was shown at trial appeared to be in the same condition as when he last saw them.  (T: 546-49, 550-52).

Forensic chemist Jeffrey Banas testified that he recognized People's Exhibits 1-A through 1-E as the evidence envelope (People's Exhibit 1-A) submitted to the laboratory and the contents of that envelope, which he described as four knotted plastic bags each containing a solid substance (People's Exhibits 1-B, 1-C, 1-D, and 1-E).  (T: 621-28, 633).  On May 25, 2013, Banas analyzed the solid substance using standardized testing methods and determined it was cocaine having an aggregate weight of 4.21 ounces.  (T: 622, 626).

When Banas originally received the envelope from the laboratory technician who took it out of the locker, it was still sealed with evidence tape.  (T: 628).  Banas always wore gloves when handling the envelope and its contents.  (T: 629).

Forensic biologist Maria Orsino testified that she performed a type of DNA analysis (polymerase chain reaction, short tandem repeat) on swabs taken from the bags of drugs submitted into evidence.  (T: 651, 654-56).  She obtained four separate DNA profiles for each bag (T: 656) and compared them to a known DNA sample from Petitioner (T: 653).  Orsino wore gloves and a face mask while performing the testing.  (T: 654).  Based on her analysis, she determined, among other things, that Petitioner's DNA profile matched a major DNA profile on one of the bags.  (T: 662-63).  Orsino explained that the probability of randomly selecting, out of the 316 million individuals in the United States, an unrelated individual with a DNA profile that matched the major DNA profile on the bag was at least one in 408 quadrillion.  (T: 663).  Orsino concluded that, to a reasonable degree of scientific certainty, Petitioner was the source of the major DNA profile on that bag.  (T: 663).

Petitioner testified that he left his parole-approved residence at 195 Colvin on May 6, 2013, and started staying with his then-girlfriend, Adriana Satcher, at 1002 Walden.  (T: 744-45).  Petitioner got into a fight with her father, who called the Cheektowaga police and had Petitioner arrested.  Petitioner was detained and released on May 21, 2013.  (T: 745, 816-17).  Because he needed a place to stay, he called Evans, his "best friend" and "on again, off again girlfriend" for 14 years, to see if he could stay over at her apartment at 448 Amherst.  (T: 745-46).  Evans also had an address in Albany because she had two jobs there, and she owned a house on St. Mary's in Buffalo.  (T: 769-70).  Evans agreed that

Petitioner could stay over at 448 Amherst, and he arrived on the evening of May 21, 2013. (T: 746).  Evans let him in but left later that evening to go to her mother's house to babysit her nephew.  (T: 746-47, 771).

During the early morning hours of May 22, 2013, Petitioner became ill and vomited in the upstairs bathroom.  (T: 749-50).  Evans had come back to 448 Amherst at some point and brought him a glass of water.  (T: 750-51).  Petitioner stayed in the bathroom from about 6:30 a.m. until he heard the police arrive.  He jumped out of the window in his boxer shorts because he was afraid of being arrested for violating his parole conditions and spending a couple years in prison.  (T: 751-52).

Petitioner testified that he did not see a shoebox with cocaine in it while he was at 448 Amherst, and that he was never in possession of the cocaine admitted into evidence. (T: 754, 761).  Petitioner claimed that prior to bringing him to the hospital, the police had told him that he was going to be charged with possession of cocaine.  (T: 756).  When asked about his alleged statement to Officer Donovan, Petitioner stated that he "couldn't say that [he] did" make it, but he had "made the statement before when Tijuana was in trouble, so possibly."  (T: 760).  He later explained on cross-examination that in October of 2011, Evans got caught with crack in her purse, and he told the police he would "take the charges." (T: 810-11).

Petitioner admitted that he called Evans two hours after she testified in the grand jury.  (T: 773, 832).  She did not want to speak over the phone about her testimony but he demanded to know what she said.  (T: 773-74).  He called Evans again on December 1, 2014, at the start of trial, and told her there was a material witness warrant for her arrest.

(T: 833-34).  He admitted commenting to her during the December 1st phone call that he thought she was "in the hole," and that she needed to "get Swayze," but he denied that these terms, respectively, meant "in hiding" and "to ghost, to disappear."  (T: 835-36).  According to Petitioner, "hole" meant a place where someone spends a majority of their time, and Evans was on her computer most of the time trying to help Petitioner research his case.  (T: 841).  Petitioner said that "get Swayze" meant to "get persuasive," and that Evans was "talking about [his] emotion."  (T: 836).  Petitioner testified that during his conversations with Evans, he told her that he was going to "bite the bullet for her on this one."  (T: 840).  However, he denied telling her not to testify and stated that he had no idea why she was not present at the trial.  (T: 841).

## 2.  The Missing Witness Jury Instruction

During the charge conference, the prosecutor requested that the trial court issue a missing witness instruction as to Evans.  (T: 849).  The prosecutor argued that all of the prerequisites set forth in *People v. Gonzalez*, 68 N.Y.2d 424 (1986),[6] were met, and that the

---

[6]     The New York Court of Appeals explained in *Gonzalez*, 68 N.Y.2d at 428:

Once the party seeking the [missing witness] charge has established *prima facie* that an uncalled witness is knowledgeable about a pending material issue and that such witness would be expected to testify favorably to the opposing party, it becomes incumbent upon the opposing party, in order to defeat the request to charge, to account for the witness' absence or otherwise demonstrate that the charge would not be appropriate.  This burden can be met by demonstrating that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony would be cumulative to other evidence, that the witness is not "available", or that the witness is not under the party's "control" such that he would not be expected to testify in his or her favor.

defense could not demonstrate that the charge was inappropriate.  In particular, the prosecutor argued, Evans's testimony was material and non-cumulative because she was present during the relevant events leading to Petitioner's arrest; that Evans, whom Petitioner said was his closest friend and sometimes girlfriend, would be expected to testify favorably for the defense; and that Petitioner and his mother both had access to Evans, given they had been in contact with her by phone before and during the trial.  (T: 850-51).

Petitioner's trial counsel, Ms. Musarra, responded that there was "absolutely no evidence" that Evans was under control of the defense, pointing out that Evans originally had been charged in connection with the cocaine found in the apartment and had testified at the grand jury for the prosecution.  (T. 851).  She also noted that despite the efforts of investigators, state troopers, and local law enforcement officers, Evans could not be located. (T: 851).

After briefly recessing, the trial court granted the prosecution's request.  According to the trial court, both parties "could effectively argue" for and against the instruction (T: 853), but it ultimately found that giving the charge "will certainly make closing arguments a little cleaner."  (T: 853).  The trial court then read the language he intended to provide to the jury.  (T: 853-54).  Ms. Musarra noted her continued objection.  (T: 854).

The missing witness charge given to the jury read as follows:

The People contend that another person, Tijuana Evans, has knowledge relevant to [the] issue [of whether the defendant possessed the alleged].  The defense did not call Tijuana Evans as a witness.  The fact that Tijuana Evans was not called[ ] as a witness permits, but does not require an inference that had she been called, her testimony would not have supported the defense'[s] position on the issue.  Before you are permitted to draw that inference, however, you must be satisfied, one, that Tijuana Evans has material

knowledge about that issue.  Two, that she is in the control of the defense in that, if called, she would be expected to testify favorably for the defense. Three, that her testimony would not have been merely cumulative to other testimony or evidence in the case.  And four, that she was available to be produced and called by the defense as a witness at this trial.  If you are not satisfied of each of those facts, then you must not consider the fact that the defense did not call Tijuana Evans to testify.  On the other hand, if you are satisfied of those facts, then our law permits, but does not require, you to infer that had Tijuana Evans testified, her testimony would not have supported the defenses' [sic] position on that issue.  Keep in mind that the drawing of this inference, if you decide to draw it, does not shift the burden of proof to the defendant.  The People always retain the burden of proving the defendant's guilt beyond a reasonable doubt.

(T: 927-28).

### C. The Verdict, the Post-Verdict Motion, and Sentencing

The jury returned a verdict convicting Petitioner as charged in the indictment of second-degree criminal possession of a controlled substance.  (T: 968-69).

Petitioner discharged Ms. Musarra and retained new counsel, Scott Riordan, Esq., for purposes of filing a motion to set aside the verdict pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30.  (*See* 3/17/15 Transcript ("Tr.") at 2-3, Resp't Ex. A). On September 21, 2015, Mr. Riordan filed a motion to set aside the verdict raising the following arguments:  (1) the trial court erred in denying his request to charge the lesser included misdemeanor offense of seventh-degree criminal possession of a controlled substance; (2) the trial court erred in granting the prosecution's request for a missing witness charge; (3) defense counsel was ineffective for failing to challenge the chain of custody with regard to the bags of cocaine, which was "described in fundamentally inconsistent ways"; (4) the evidence was legally insufficient to support the verdict; and (5)

defense counsel was ineffective for failing to move to dismiss the indictment pursuant to C.P.L. § 30.30.[7]  (*See* C.P.L. § 330.30 Motion, Resp't Ex. A).

On February 29, 2016, the prosecution submitted an affidavit in opposition.  (*See* Answering Affidavit in Opposition to C.P.L. § 330.30 Motion, Resp't Ex. A)*.*  In particular, the prosecution argued that with regard to the chain of custody issue, Petitioner failed to cite any testimony in support of his contention that the drugs were inconsistently described, and thus his claim was fatally vague.  (*See* Answering Affidavit to C.P.L. § 330.30 Motion ¶¶ 27, 29, Resp't Ex. A).  Regarding the failure to make a C.P.L. § 30.30 motion, the prosecution set forth a detailed timeline showing that 156 days, at most, were chargeable against them.  (*Id.* ¶¶ 36-47).  Thus, the prosecution argued, they were trial-ready within the six months required by statute.  The prosecution specifically addressed Petitioner's argument about the period between October 17, 2014, when the trial court ordered Petitioner to supply a buccal sample for DNA testing, and the start of trial on December 1, 2014.  Originally, trial was scheduled to begin on October 27, 2014.  At the October 17, 2014 appearance, Ms. Musarra requested an adjournment until December 1, 2014, because Petitioner wanted additional time to access the law library at the Erie County Holding Center.  (*See id.* ¶ 41 (citing 10/17/14 Tr. at 4-6, Resp't Ex. A)).  The prosecution stated

---

[7]     "Under CPL [§] 30.30, the [prosecution] must be ready for trial within six months of the commencement of the criminal action in which a felony is charged[.]"  *People v. Goss*, 87 N.Y.2d 792, 796 (1996) (citing N.Y. Crim. Proc. Law § 30.30(1)(a)).

that they would be ready for trial on October 27, 2014, and confirmed with Ms. Musarra that the further adjournment was at the request of the defense.  (10/17/14 Tr. at 6).[8]

The parties appeared before the trial court for oral argument on the motion on March 2, 2016.  The trial court denied the C.P.L. § 330.30 motion for the reasons stated in the prosecution's opposition papers.  (3/2/16 Tr. at 12, Resp't Ex. A).

Petitioner elected to proceed with sentencing after the C.P.L. § 30.30 motion was denied.  The prosecutor sought to have him adjudicated as a second felony offender, and Petitioner admitted to two prior violent felony convictions.  (3/2/16 Tr. at 13-14).  The trial court sentenced Petitioner as a second felony offender to a determine term of twelve years plus five years of post-release supervision.  (3/2/16 Tr. at 20-21).

### D.  Post-Judgment Proceedings in State Court

#### 1.  Direct Appeal

Petitioner's assigned appellate counsel, Sherry Chase, Esq., filed a brief on his behalf in the Appellate Division, Fourth Department, of New York State Supreme Court.  Ms. Chase urged reversal of the conviction on the following grounds:  (1) the trial court erroneously granted the prosecution's request for a missing witness charge; (2) the trial court erroneously found that Petitioner lacked standing, and the warrantless parole search of the apartment did not relate to a parole purpose; (3) the verdict was against the weight of

---

[8]     When the defense requests adjournments, such time-periods must be excluded when computing the prosecution's compliance with C.P.L. § 30.30.  *People v. Kopciowski*, 68 N.Y.2d 615, 616 (1986) (citing N.Y. Crim. Proc. Law § 30.30(4)(b), (f)).  "Where adjournments are allowed at defendant's request, those periods of delay are expressly waived in calculating the [prosecution]'s trial readiness, without the need for the [prosecution] to trace their lack of readiness to defendant's actions."  *Id.* at 617.

the credible evidence; and (4) the sentence was harsh and excessive. (*See* Counseled Appellate Brief, Resp't Ex. B).

Petitioner filed a *pro se* supplemental appellate brief raising the following arguments: (1) defense counsel was ineffective for failing to assert a statutory speedy trial violation; (2) the trial court's missing witness charge shifted the burden of proof to the defense; (3) the prosecution failed to authenticate the chain of custody of the drugs; (4) the trial court erroneously found that Petitioner lacked standing to seek suppression of the drugs; and (5) Petitioner was entitled to have the jury instructed on the lesser included offense of seventh-degree criminal possession of a controlled substance under N.Y. Penal Law § 220.03. (*See Pro Se* Supplemental Appellate Brief, Resp't Ex. B).

The Appellate Division unanimously affirmed the conviction on June 8, 2018. *People v. Carey*, 162 A.D.3d 1476 (4th Dept. 2018). As relevant here, the Appellate Division rejected the contention that the trial court's ruling as to the missing witness charge was erroneous as a matter of state law, finding that "the [prosecution] established that the girlfriend would have provided testimony on a material issue in the case and would have testified favorably for defendant." *Carey*, 162 A.D.3d at 1477.

The Appellate Division further rejected as "without merit" Petitioner's contention that the missing witness charge improperly shifted the burden of proof to the defense. *Id.* The Appellate Division observed that "[a]lthough a court may not ordinarily comment on a defendant's failure to testify or otherwise come forward with evidence at trial, . . . once a defendant does so, the customary standards for giving a missing witness charge apply." *Id.* (ellipsis in original) (quoting *People v. Macana*, 84 N.Y.2d 173, 177 (1994)).

- 16 -

With regard to the Fourth Amendment claim, the Appellate Division concluded that Petitioner "established his standing at least as an overnight guest, if not as something more." *Id.* Thus, he had a legitimate expectation of privacy in the premises at 448 Amherst Street and had standing to contest the reasonableness of the search. *See id.* Nonetheless, the Appellate Division "agree[d] with the court's further determination . . . that the search of the apartment was lawful" because it "was rationally and reasonable related to the parole officers' duties 'to detect and to prevent parole violations for the protection of the public from the commission of further crimes.'" *Id.* (quoting *People v. Huntley*, 43 N.Y.2d 175, 177 (1977)).

Finally, the Appellate Division rejected the contention that counsel provided deficient representation by failing to make a C.P.L. § 30.30 motion. The Appellate Division explained that the appellate record "[did] not support [the] contention that there was a speedy trial violation," and "[t]here can be no denial of effective assistance of trial counsel from counsel's failure to make a motion or argument that has little or no chance of success." *Id.* (quoting *People v. Caban*, 5 N.Y.3d 143, 152 (2005) (alteration in original; internal quotation marks omitted)). The Appellate Division further found that, to the extent the ineffectiveness claim involved "matters outside the record on appeal, it must be raised by way of a motion pursuant to CPL [§] 440.10." *Id.*

Ms. Chase sought leave to appeal as to all issues raised before the Appellate Division. The New York Court of Appeals denied leave on August 31, 2018. *People v. Carey*, 32 N.Y.3d 936 (2018).

### 2.  Motion to Vacate the Judgment

While his direct appeal was pending, Petitioner filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10 on March 1, 2017, in the Erie County Court.  He argued that Mr. Schwartz and Ms. Musarra were ineffective in failing to move to dismiss the indictment pursuant to C.P.L. § 30.30 and that Ms. Musarra was ineffective in failing to challenge the chain of custody of the drugs.  (*See* C.P.L. § 440.10 Motion (unpaginated), Resp't Ex. D).  The prosecution filed an Opposing Affidavit.  (Resp't Ex. D).  The trial court denied the motion on the merits on February 8, 2018, finding that Petitioner's individual contentions were meritless and that, overall, he received competent representation from the attorneys who represented him.  (*See* Order Denying C.P.L. § 440.10 Motion at 3, 4, 5-6, Resp't Ex. D).  Petitioner did not seek leave to appeal to the Appellate Division.

### 3.  *Coram Nobis* Application

Petitioner's habeas counsel, Jodi Morales, Esq., filed an application for a writ of error *coram nobis* in the Appellate Division.  (*See* Notice of Motion, Attorney Affirmation, and Memorandum of Law in Support of *Coram Nobis* Application ("*Coram Nobis* Memorandum"), Resp't Ex. E).  Petitioner asserted that the trial court's ruling on standing—later found to be erroneous by the Appellate Division—removed any incentive for defense counsel to reopen the suppression hearing and foreclosed a later motion to reopen, thereby depriving Petitioner of counsel at a critical stage; that appellate counsel did not effectively argue that defense counsel erred in failing to move to reopen the suppression hearing; that appellate counsel failed to assert that defense counsel was ineffective for

failing to seek an adequate remedy for the prosecution's improper references to Petitioner's supposed gang affiliation; that appellate counsel failed to raise defense counsel's ineffectiveness based on the failure to request a hearing to challenge Petitioner's statements to police; and that appellate counsel should have argued that the trial court's refusal to entertain a for-cause challenge to a prospective juror who was the prosecutor's close friend amounted to reversible error. (*See* Attorney Affirmation ¶¶ 8, 10-11, Resp't Ex. E; *Coram Nobis* Memorandum at 10-21, Resp't Ex E).  The Appellate Division summarily denied relief on December 20, 2019.  *See People v. Carey*, 178 A.D.3d 1469 (4th Dept. 2019).  The New York Court of Appeals denied Petitioner's leave application on June 4, 2020.  *People v. Carey*, 35 N.Y.3d 1025 (2020).

## III.   <u>STANDARD OF REVIEW</u>

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011) ("*Richter*").  AEDPA "revised the conditions under which federal courts may grant habeas relief to a person in state custody."  *Kruelski v. Connecticut Superior Ct. for Jud. Dist. of Danbury*, 316 F.3d 103, 106 (2d Cir. 2003).  Now, under § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if the state court decides a case differently than th[e] [Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Section 2254(d)'s standard for reviewing claims adjudicated on the merits by state courts is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam).

## IV.   ANALYSIS OF THE PETITION

### A. Violation of Due Process Based on the Missing Witness Jury Charge (Ground Two)

The Appellate Division adjudicated Petitioner's missing witness instruction claims on the merits as contemplated by 28 U.S.C. § 2254(d) because it rejected them on substantive grounds, without any indication that it was denying them due to a procedural bar. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the

claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Therefore, AEDPA's limitations on relief in § 2254(d) apply.

Petitioner repeats his argument, raised on direct appeal, that granting the prosecution's request for a missing witness charge was erroneous as a matter of state law. (*See* Dkt. 6 at 7-8). In particular, Petitioner asserts, the Appellate Division "ignored" New York State case law holding that where "the uncalled witness [is] a codefendant likely to invoke the Fifth Amendment and refuse to testify," or is an "uncalled accomplice[ ], even if uncharged," "a missing witness charge against the defense would be inappropriate.'" (*Id.* at 7 (alteration in original) (quoting *Macana*, 84 N.Y.2d at 178)). Petitioner argues that the prosecution could not and did not "show that [Evans] would have waived her Fifth Amendment [p]rivilege." *Id.*

A federal court reviewing a state court conviction "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).

Petitioner has misread *Macana*'s instructions regarding which party bears the burden of showing the uncalled witness is unavailable. *Macana* explained that "when[, as here,] the defendant is the only source of proof . . . that favorable testimony of [the] [uncalled]

witness would be self-incriminating[,]" 84 N.Y.2d at 178, "some additional, nonprejudicial substantiation by the defendant" is required, *id*. at 179.

Petitioner has never provided such verification that Evans's testimony would be self-incriminating. Indeed, he did not argue before the trial court that Evans should have been deemed unavailable to him because she would have invoked her Fifth Amendment privilege against self-incrimination. And the prosecution indicated in their opposition to the C.P.L § 330.30 motion that Evans was granted transactional immunity[9] in connection with her testimony before the grand jury. (*See* Answering Affidavit to C.P.L. § 330.30 Motion ¶ 23, Resp't Ex. A). Thus, Petitioner has not shown that the Appellate Division committed an error of state law in upholding the trial court's ruling. *See Macana*, 84 N.Y.2d at 179-80 (finding that trial court did not abuse its discretion in granting a missing witness charge against the defendant "in the absence of any verification that the witness' testimony would be self-incriminating and he would likely refuse to testify on self-incrimination grounds").

Nor has Petitioner demonstrated an "error [that] violated a right guaranteed to him by federal law." *Casillas*, 769 F.2d at 63. According to Petitioner, the charge shifted the burden of proof to the defense and thereby violated his due process right not to be convicted except upon proof beyond a reasonable doubt. (*See* Dkt. 6 at 9 (citing *Sandstrom v. Montana*, 442 U.S. 510 (1979); *Francis v. Franklin*, 471 U.S. 307 (1985) ("*Franklin*")). Under *Sandstrom*, the Fourteenth Amendment's due process clause "prohibits the State

---

[9]     "Transactional immunity . . . accords full immunity from prosecution for the offense to which the compelled testimony relates. . . ." *Kastigar v. United States*, 406 U.S. 441, 453 (1972).

from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Franklin*, 471 U.S. at 313 (citing *Sandstrom*, 442 U.S. at 520-24).  The "threshold inquiry . . . is to determine the nature of the presumption[,]" *id.* at 313-14 (quoting *Sandstrom*, 442 U.S. at 514), described in the jury charge—whether it is mandatory or permissive, *id.* at 314.  A permissive inference "does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Franklin*, 471 U.S. at 314.

No portion of the missing witness instruction read to the jury and quoted above in this Decision "could reasonably have been understood as creating a presumption that relieve[d] the State of its burden of persuasion on an element of [the] offense," *Franklin*, 471 U.S. at 315, with which Petitioner was charged.  In fact, the trial court specifically reminded the jury at the end of the missing witness instruction that the burden of proof remained with the prosecution.  *See Caccia*, 122 F.3d at 140 (on direct review of a criminal conviction, where missing witness "was not realistically as available to the defendant as to the Government", finding that "no constitutional violation occurred [under *Franklin*]," "especially in light of . . . cautionary instruction . . . that the defendant had no legal obligation to produce any witnesses").

Moreover, the Supreme Court's clearly established precedent provides that a jury is "normally presume[d] . . . [to] follow an instruction to disregard inadmissible evidence inadvertently presented to it." *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) (citing

*Richardson v. Marsh*, 481 U.S. 200, 208 (1987)).  That presumption may be disregarded if two factors are present—"an 'overwhelming probability' that the jury will be unable to follow the court's instructions," *id.* (citing *Richardson*, 481 U.S. at 208), "and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant," *id.* (quoting *Bruton v. United States*, 391 U.S. 123, 136 (1968)).  Petitioner has not alleged or established that either factor is present in this case.  Therefore, the Court presumes that the trial court's "reminder adequately preserved the constitutional requirement that the burden of proof is never on the defendant."  *Caccia*, 122 F.3d at 140.

Petitioner has also not shown that the instruction "rest[ed] on an unreasonable conclusion from the facts."  *Id.* (citing *Franklin*, 471 U.S. at 314-15 ("A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.")).  Based on the trial record, Evans undoubtedly had material testimony to offer about the key issue in the case, constructive possession of the cocaine.  Not only was Evans present for Petitioner's arrest and the seizure of the cocaine, but she had also rented the apartment from Fortner and had gone on the walk-through with him.  (T: 458).  Thus, she was familiar with the layout of the apartment.  According to Petitioner, the apartment was filled with Evans's belongings, which he had helped her move.  (T: 761-62).  Petitioner also implied that Evans might have had some knowledge about the owner of the cocaine (*see*, *e.g.*, T: 831 (noting that "the prosecutor let her go when she was the more likely person to have had these drugs")), and how his DNA profile could have ended up on some of the items seized (*see*, *e.g.*, T: 793-95 (explaining that he helped her carry groceries in plastic bags into the house)).

- 24 -

Petitioner's own testimony supported the conclusion that Evans would have testified favorably for the defense.  Petitioner characterized Evans's testimony as "imperative to [his] freedom," which led him to call her just hours after her grand jury testimony and demand to know what she had said.  (T: 832).

As to the element of control over the witness, Petitioner testified that he and Evans had been the "[b]est of friends" for 14 years, and at times intimate partners.  (T: 765). Furthermore, Petitioner admitted that Evans visited him in jail approximately 33 times (T: 829), and they talked on the phone while he was in jail "hundreds of times" (T: 830-31). Four days prior to the start of trial, Petitioner spoke to Evans on two separate occasions. (T: 833-34).  Thus, there was significant evidence that Evans was under Petitioner's control.

In sum, Petitioner has not established that the Appellate Division unreasonably applied the principles in *Franklin* and *Sandstrom* to the facts of his case, *see* 28 U.S.C. § 2254(d)(1); that the Appellate Division's ruling was contrary to a ruling reached by the Supreme Court in a case with materially indistinguishable facts, *see id.*; or that the Appellate Division's decision resulted from an unreasonable determination of the facts in light of the evidence presented in state court, *see id.* § 2254(d)(2).  Because Petitioner has not satisfied the conditions in 28 U.S.C. § 2254(d), habeas relief is unavailable for Petitioner's claims based on the missing witness instruction.

## B.  Ineffective Assistance of Trial Counsel (Ground Four)

### 1.  Exhaustion and Procedural Default

Respondent has raised the defenses of failure to exhaust and procedural default in opposition to Petitioner's claim of ineffective assistance of trial counsel.  In particular,

Respondent asserts that the ineffective assistance of trial counsel claim (consisting of the errors related to the failure to file a C.P.L. § 30.30 motion and challenge the chain of custody) is unexhausted because Petitioner did not seek leave to appeal the denial of C.P.L. § 440.10 motion.  (Dkt. 5 at 15).  Respondent also argues that Petitioner "no longer has any procedure available to him in state court by which to raise the unexhausted claim[,]" which Respondent urges is subject to future procedural bars.  (*Id.*).  Petitioner counters that he was left in an exhaustion "catch-22" because the trial court ruled in the order denying the C.P.L. § 440.10 motion that the claim should have been raised on direct appeal.  However, the Appellate Division subsequently ruled that to the extent the claim rested on information outside the record, it should have been raised in a C.P.L. § 440.10 motion.  Petitioner contends that even if the claim is procedurally defaulted, he has shown cause and prejudice to excuse the procedural default.

"'[I]n habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit.'"  *Quinney v. Conway*, 784 F. Supp. 2d 247, 260 (W.D.N.Y. 2011) (alteration in original) (quoting *Boddie v. New York State Div. of Parole*, 288 F. Supp. 2d 431, 439 (S.D.N.Y. 2003); citing *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997) (stating that bypassing procedural questions to reach the merits of a habeas petition is justified in rare situations, "for example, if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law")).

Moreover, AEDPA now gives district courts the authority to deny a petition containing unexhausted claims on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  The rationale behind 28 U.S.C. § 2254(b)(2) has been described as "spar[ing] state courts from needlessly wasting their judicial resources on addressing meritless claims solely for the sake of exhaustion." *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010).  In this Circuit, the various formulations for the proper standard to be used when relying on § 2254(b)(2) share "the common thread of disposing of unexhausted claims that are unquestionably meritless." *Id.* (collecting cases); *see also Barnes v. Uhler*, No. 6:18-CV-06428 EAW, 2021 WL 5176667, at *14 (W.D.N.Y. Nov. 8, 2021) (relying on "unquestionably meritless" standard referenced in *Keating* to dismiss unexhausted claims). Because all of the petition's claims are readily denied on the merits, and because the potentially unexhausted ineffective assistance claims in particular are "unquestionably meritless," the Court will exercise its discretion to bypass the issues of exhaustion and procedural default.  As discussed below, Petitioner has not established a meritorious Sixth Amendment ineffective assistance claim under any standard of review.

"The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012).  To establish that counsel was not functioning as the effective counsel guaranteed by the Sixth Amendment, a petitioner must satisfy the two-pronged test in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must show that his "attorney's representation amounted to

incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).  Second, the petitioner must show that counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.  Under *Strickland*, prejudice "is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 696.  "[A] court need not address both components of the *Strickland* inquiry if a petitioner makes an insufficient showing on one." *Id.* at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With regard to the prejudice component, "the likelihood of a different result in the absence of the alleged deficiencies in representation 'must be substantial, not just conceivable.'" *Garner v. Lee*, 908 F.3d 845, 849 (2d Cir. 2018) (quoting *Richter*, 562 U.S. at 112; citing *Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.")).  The Supreme Court has admonished lower courts to keep in mind that "[t]he object of an ineffectiveness claim is not to grade counsel's performance." *Strickland*, 466 U.S. at 697.  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam).

### 2.  Failure to File a C.P.L. § 30.30 Motion

Petitioner presented his ineffective assistance claim based on the failure to bring a motion to dismiss the indictment under C.P.L. § 30.30 to the trial court twice, in the C.P.L. §§ 330.30 and 440.10 motions; and to the Appellate Division on direct appeal.  As noted

above, in its response to the C.P.L. §§ 330.30 and 440.10 motions, the prosecution exhaustively detailed the amount of time chargeable against the speedy trial clock and demonstrated that, at most, 156 days should be charged.  Both the Appellate Division and the trial court concluded that there was no statutory speedy trial violation, which means that a motion to dismiss the indictment pursuant to C.P.L. § 30.30 had no likelihood of success. For this reason, Petitioner cannot show that Mr. Schwartz's or Ms. Musarra's failure to make a C.P.L. § 30.30 motion had any effect on the outcome of his criminal proceeding. In addition, it cannot be professionally unreasonable for an attorney to decline to make a motion that is unsupported by the facts of record and the law.  *See United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance[.]") (citing *United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir. 1992)).

### 3.  Failure to Challenge the Chain of Custody of the Drugs

In her thorough cross-examinations of Officer Cino and forensic chemist Banas, Ms. Musarra sought to undermine the integrity of their procedures for recovering, handling, and testing the drugs seized at 448 Amherst.  During her summation, Ms. Musarra highlighted alleged discrepancies in the prosecution witnesses' handling of the drugs and argued generally that the police work was shoddy.  (T: 877-79, 880-86).  Nonetheless, Petitioner claims that there were important issues that Ms. Musarra overlooked—chiefly, that the prosecution failed to call the lab technician who handed the sealed evidence envelope to Banas and that Officer Cino's description of the drugs as being wrapped in plastic and Banas's observation that they were in knotted plastic bags demonstrated that the evidence

seized at 448 Amherst was not identical to the evidence tested and found to be cocaine. (*See Pro Se* Supplemental Appellate Brief at Point III, Resp't Ex. B).

Contrary to Petitioner's assertion, Ms. Musarra did call the jury's attention to the different descriptions given by Officer Cino and Banas of how the cocaine was packaged and asked, "Where did the condition change?" (T: 886). Therefore, this claim of error by Ms. Musarra is factually baseless.

With regard to the failure to call the laboratory technician, an objection on this ground was meritless and would not have had a reasonable possibility of preventing the admissibility of the drugs. Under New York law, "real evidence may be admitted at trial if the offering party establishes that the proffered evidence is identical to the evidence associated with the crime and that it has not been tampered with." *People v. Pacheco*, 274 A.D.2d 746, 747 (3d Dept. 2000) (citing *People v. Julian*, 41 N.Y.2d 340, 342-43 (1977)). "These elements normally are addressed through the testimony of each individual who came in contact with the proffered evidence," *id.* (citing *Julian*, 41 N.Y.2d at 343), but "the testimony of each individual who came in contact with the proffered evidence is not necessary to establish the requisite chain of custody if the party offering the real evidence can provide reasonable assurances of its identity and unchanged nature." *Id.*

Here, it was unnecessary to call the lab technician because Petitioner has not established that the drugs had changed from the time that they were recovered to the time they were introduced at trial. Officer Cino testified that he sealed the envelope containing the cocaine and deposited it in a self-locking receptacle; Banas testified that when he was handed the envelope by the lab technician three days later, the seal originally placed by

Officer Cino was intact.  This evidence provided reasonable assurances that the cocaine "offered [was] the [cocaine] recovered and that its condition was substantially unchanged." *People v. Connelly*, 35 N.Y.2d 171, 175 (1974); *see also*, *e.g.*, *People v. Newman*, 129 A.D.2d 742, 742 (2d Dept. 1987) ("The officer testified that he sealed the package, locked it in a vault and three days later, mailed it to the laboratory in the same condition.  It was established by documentary evidence that the laboratory received the package and the chemist testified that when he removed the narcotics for analysis, the seal was intact.  The foregoing evidence provided reasonable assurances of the identity of the narcotics and of their unchanged condition.").  Furthermore, the purported discrepancy between Officer Cino's and Banas's descriptions of the plastic packaging was inconsequential.  At most, it went to the weight of the evidence, not its admissibility.  *See Newman*, 129 A.D.2d at 742 (stating that "certain notations on a laboratory report which were inconsistent with the testimony of the undercover officer were not reflective of deficiencies in the chain of custody, but rather were irregularities bearing only on the weight of the evidence") (citing *Connelly*, 35 N.Y.2d at 175).  Moreover, the trial court, in denying the C.P.L. § 440.10 motion, concluded that Petitioner "failed to show that the chain of custody of the drugs was compromised in any way."  (Order Denying C.P.L. § 440.10 Motion at 4, Resp't Ex. D).  Thus, Ms. Musarra's failure to raise Petitioner's suggested objections to the chain of custody was not professionally unreasonable; nor did it have any conceivable effect on the outcome of the trial.

An attorney who declines to file a motion or lodge an objection that has no reasonable chance of success cannot be said to have performed unreasonably under

"prevailing professional norms," *Strickland*, 466 U.S. at 688. Nor can such a tactical decision be found to have prejudiced the defense; if the objection had no reasonable chance of succeeding, the petitioner cannot show there was a "reasonable probability," *id.* at 696, of a different result. None of the alleged errors by Mr. Schwartz and Ms. Musarra, viewed individually, appear to have been errors at all. Indeed, Petitioner has not overcome the presumption that his attorneys' actions were the product of a reasoned and legitimate trial strategy. *See id.* at 689. Furthermore, Petitioner has failed to show that the alleged errors had any effect on the outcome of the trial, much less that they were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. As Petitioner has failed to satisfy the "highly deferential," *id.* at 689, standard imposed by *Strickland*, habeas relief is unwarranted on his claims of ineffective assistance of trial counsel.

### C. Ineffective Assistance of Appellate Counsel (Grounds One and Three)

Petitioner reasserts three of the arguments challenging appellate counsel's performance that he raised in his *coram nobis* application, which the Appellate Division disposed of in a single word—"denied." Such a disposition constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d). *See, e.g.*, *Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir. 2001) (finding that the word "denied" triggered AEDPA deference). "Where, as here, the state court does not provide reasons for its dismissal of a petitioner's claim," *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015), the Court must "consider 'what arguments or theories . . . could have supported[ ] the state court's decision,'" *id.* (ellipsis and alteration in original) (quoting *Richter*, 562 U.S. at 102).

Although originally enunciated in a case concerning the ineffectiveness of trial counsel, "*Strickland*'s two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985)). Because "[c]ounsel is not obliged to advance every nonfrivolous argument that could be made," the mere omission of a "nonfrivolous argument" does not establish deficient performance. *Id.* (citing *Evitts*, 469 U.S. at 394). "To establish prejudice in the appellate context, a petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court." *Lynch*, 789 F.3d at 311.

### 1.  Inadequate Argument Regarding the Suppression Issue

Petitioner first contends that his appellate attorney, Ms. Chase, was ineffective because she failed to argue that the trial court's erroneous standing ruling deprived Petitioner of the effective assistance of counsel at a critical stage. (*See* Declaration at 3-4, ¶¶ 12-14 (Dkt. 6); Traverse at 11-15 (Dkt. 6)). Petitioner cites *United States v. Cronic*, 466 U.S. 648 (1984), for the proposition that "counsel cannot be 'prevented,' whether by a judge or a prosecutor, 'from assisting the accused during a critical stage,' as 'there can be no restrictions upon the function of counsel in defending a criminal prosecution.'" (Traverse at 12 (quoting *Cronic*, 466 U.S. at 657 n.15, 659 n.25)). Petitioner further asserts that a suppression motion is a "crucial" stage of a criminal proceeding. (*Id.* (citing *Kimmelman v. Morrison*, 477 U.S. 365 (1986)). Petitioner reasons that the trial court's erroneous standing ruling "prevented" defense counsel from moving to reopen the suppression hearing because "no defense lawyer would have thought moving to reopen posed 'a fair probability

or a likelihood . . . of success on the merits.'"  (*Id.* at 14 (ellipsis in original) (quoting *People v. Carver*, 124 A.D.3d 1276, 1279 (4th Dept. 2015)).  According to Petitioner, but for the trial court's erroneous standing ruling, defense counsel would have moved to reopen the suppression hearing after P.O. Mack testified for the first time at trial that he removed a window screen at 448 Amherst and moved Evans out of the doorway after she opened the door.  (*Id.* at 12-13).  Petitioner argues that P.O. Mack's testimony "could have changed the hearing's outcome."  (*Id.* at 12).

The types of situations contemplated by *Cronic* occur where a defendant is literally "prevented" from obtaining his counsel's assistance during a critical stage of the proceeding, *see*, *e.g.*, *Geders v. United States*, 425 U.S. 80, 91 (1976) (holding that the trial court's order preventing defendant from consulting his counsel about anything during a 17-hour overnight recess in the trial between his direct and cross-examination deprived defendant of his right to the assistance of counsel guaranteed by the Sixth Amendment); or when a rule or other limitation "deprived the accused of 'the guiding hand of counsel at every step in the proceedings against him,'" *Brooks v. Tennessee*, 402 U.S. 605, 612 (1972) (quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932)).  *See also Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (elaborating that the *Cronic* presumption of prejudice is warranted when (1) "the accused is denied the presence of counsel at a critical stage"; (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) "counsel is called upon to render assistance under circumstances where competent counsel very likely could not").  Because the trial court's adverse standing ruling clearly did not "prevent" Petitioner from having counsel's assistance at a critical stage, it did not fall within *Cronic*'s ambit.

This argument is patently meritless and did not warrant inclusion in appellate counsel's brief.

Relatedly, Petitioner argues that although Ms. Chase did assert that Ms. Musarra was ineffective in failing to move to reopen the suppression hearing based upon P.O. Mack's testimony, Ms. Chase's argument was undeveloped and did not explain why the new information would have convinced the trial court to rule in Petitioner's favor on the suppression issue.  However, the predicate claim of ineffective assistance of trial counsel (failing to move to reopen the suppression hearing) is wholly at odds with Petitioner's statements elsewhere that because defense counsel had no incentive to file a motion to reopen in light of the trial court's ruling on standing, counsel did not perform unreasonably. (*See*, *e.g.*, *Coram Nobis* Memorandum at 12 (stating that "a 'legitimate explanation' exists for counsel's failure to move to reopen the suppression hearing") (quotation omitted), Resp't Ex. E).

In any event, putting these inconsistencies aside and ignoring the adverse standing ruling, Petitioner has not shown that there is a reasonable probability that a motion to reopen based on P.O. Mack's testimony would have changed the result of the suppression hearing. The trial court did not deny the suppression motion solely based on Petitioner's lack of standing; it went on to find that the search itself was reasonable.  (*See* 9/03/14 Order Denying Suppression Motion at 6-8, Resp't Ex. A).  On direct appeal, the Appellate Division agreed with the trial court's determination of reasonableness. *Carey*, 162 A.D.3d at 1477.  Presumably, the Appellate Division—which had before it the trial transcript containing P.O. Mack's testimony—would not have upheld the suppression ruling had it

believed that P.O. Mack's testimony affected the trial court's finding that the search was reasonable. In sum, Ms. Chase competently briefed the standing argument, as evidenced by the fact that the Appellate Division agreed with her position. Petitioner has not shown that an argument based on *Cronic* or a more in-depth argument by Ms. Chase attacking Ms. Musarra for not moving to reopen the suppression hearing based on P.O. Mack's trial testimony would have resulted in a different outcome of his direct appeal.

### 2. Failure to Challenge the Voluntariness of Petitioner's Statements

Next, Petitioner contends that Ms. Chase was ineffective because she failed to argue that Mr. Schwartz was ineffective for failing to request a *Huntley* hearing to challenge the voluntariness of Petitioner's statements. Petitioner states that he was "in severe pain and ill" (*Coram Nobis* Memorandum at 19, Resp't Ex. E) at the time of the statements to Officer Donovan at the hospital. Therefore, he concludes, his condition "raised serious questions about whether his statement [sic] were voluntary or *Mirandized.*" (*Id.*). Petitioner argues that because there was a "colorable basis that may have led to suppression" of his statements (*id.*), Mr. Schwartz was ineffective in waiving a *Huntley* hearing. (*Id.*).

Under New York law, to succeed on a claim that trial counsel was ineffective for failing to make a pre-trial suppression motion, the defendant must "demonstrate the absence of strategic or other legitimate explanations" for trial counsel's alleged shortcomings. *People v. Rivera*, 71 N.Y.2d 705, 709 (1988). A defendant's mere disagreement with his attorney's strategy is insufficient to establish ineffectiveness. *See id.* at 708-09 (stating that "[a] contention of ineffective assistance of trial counsel requires proof of less than meaningful representation, rather than simple disagreement with strategies and tactics").

Thus, the presence of an allegedly "colorable" basis to move for suppression did not automatically obligate Mr. Schwartz to make such a motion.  *See People v. Sposito*, 193 A.D.3d 1236, 1236 (3d Dept. 2021) ("A defense attorney is not obliged to seek suppression of a defendant's statements, and it is a 'rare case where a defendant shows the absence of a strategic or legitimate explanation in counsel's strategy not to' do so."), *aff'd*, 37 N.Y.3d 1149 (2022).  Petitioner has not demonstrated the absence of strategic or other legitimate explanations for waiving a *Huntley* hearing, and such a conclusion is not supported by the record.

The proffered argument for finding the statement involuntary—that Petitioner was physically ill and in pain as well as mentally "in and out" (T: 758)—was weak.  To conclude that a confession is involuntary under the Due Process Clause of the Fourteenth Amendment, a court must find that it was the result of "coercive police activity."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also People v. Thomas*, 22 N.Y.3d 629, 643 (2014) ("[W]hat the Due Process Clause of the Fourteenth Amendment forbids is a coerced confession. . . .").  Although a defendant's "mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."  *Id.* at 165; *see also Culombe v. Connecticut*, 367 U.S. 568, 602 (1961) (listing the confessor's "mental state" as one of the "relevant" factors in the voluntariness inquiry).  Likewise, courts have found that an accused's physical distress does not necessarily negate the voluntariness of a confession. *See*, *e.g.*, *United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012), *as amended* (Nov. 15, 2012) (finding statements voluntary because defendant "was lucid and able to engage

the agents in coherent conversations despite the pain attendant to her injury"); *United States v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000) (finding statements knowing and voluntary although suspect was in the hospital for surgery at time of questioning because he "was alert and mentally competent at the time of the questioning" despite being in pain).

Here, Petitioner he has not pointed to *any* facts suggesting that his statement was in response to police questioning, let alone that he was subjected to any psychological or physical coercion by Officer Donovan or his partner.  "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective."  *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998).

An argument that the statement to Officer Donovan should have been suppressed because Petitioner was not read the *Miranda* warnings was just as weak.  "[B]oth the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by *Miranda*."  *People v. Huffman*, 41 N.Y.2d 29, 33 (1976).  Even assuming that Petitioner had a colorable argument that he was in custody, there is no suggestion that he was subjected to "interrogation" by Officer Donovan or his partner, as noted above.

In short, the arguments that Petitioner claims Mr. Schwartz should have made had no reasonable probability of persuading the trial court to suppress the statements. Therefore, Mr. Schwartz was not unreasonable in declining to request a *Huntley* hearing, and his failure to do so did not prejudice Petitioner.  Because the underlying ineffective assistance claim was meritless, Petitioner has not shown that Ms. Chase unreasonably

omitted a winning ineffective assistance argument from her appellate brief.  Likewise, he cannot demonstrate a reasonable probability of a different outcome if Ms. Chase had included that issue on his direct appeal.

### 3. Failure to Argue Defense Counsel's Ineffectiveness Based on the Failure to Object to Gang References

Finally, Petitioner asserts that Ms. Chase was ineffective in declining to argue that Ms. Musarra was ineffective for failing to object to references by P.O. Mack to Petitioner's supposed gang affiliation.  Again, Petitioner has not demonstrated that Ms. Chase omitted a meritorious argument.  A review of the trial transcript indicates that while Ms. Musarra did not object to P.O. Mack's initial reference to a potential gang-type of insignia on a men's shirt found at 448 Amherst (T: 480-81), she did object when P.O. Mack testified that he found a "female sex toy" that was "the same color as the sneakers and the hat and stuff, which could have been gang material." (T: 483-84).  The trial court sustained the objection. (T: 484).  A short while later, during a recess, Ms. Musarra argued that P.O. Mack had testified "gratuitously" and "without being asked" that certain items potentially depicted a gang symbol or were in gang-affiliated colors.  (T: 514).  She argued that P.O. Mack was attempting to influence the jury and have them speculate that Petitioner had a gang connection.  (T: 514, 517).  When the trial court offered to give a curative instruction, Ms. Musarra responded that she did not think that would "be enough" (T: 515), since the jury had not just heard P.O. Mack's testimony but also had seen a staged photograph (People's Exhibit 10, T: 486-87) of the bandanna, hat, and sneakers, which were all the same color that P.O. Mack had testified was potentially affiliated with a gang.  (T: 515).  Accordingly,

she also requested that the trial court strike People's Exhibit 10 from the record.  (T: 515).

The trial court granted both remedies.  (T: 518, 520).  After striking the photograph from

the record, the trial court issued a curative instruction telling the jury to "disregard any

mention of gang or gang-related issues or items, that's been stricken from the record as

irrelevant and speculative."  (T: 520).

According to Petitioner, Ms. Musarra herself believed that a curative instruction was

inadequate yet she acquiesced in the trial court's issuance of such an instruction and did not

request a mistrial.  (*See Coram Nobis* Memorandum at 15-16, Resp't Ex. E).  Petitioner's

argument relies on a mischaracterization of the record.  It is true that Ms. Musarra did not

believe that a curative instruction standing alone was sufficient.  What Petitioner neglects

to mention is that Ms. Musarra also requested that the photograph be stricken from the

record.  Therefore, she did not acquiesce in a remedy—a curative instruction only—that

she believed would be ineffectual.

Moreover, Petitioner has failed to demonstrate that Ms. Musarra had a winning

argument to make in support of a mistrial motion under C.P.L. § 280.10(1).[10]  "The decision

to declare a mistrial rests within the sound discretion of the trial court, which is in the best

position to determine if this drastic remedy is truly necessary to protect the defendant's

right to a fair trial."  *People v. Diaz*, 189 A.D.3d 1063, 1066 (2d Dept. 2020) (citing *People

v. Hardy*, 26 N.Y.3d 245, 251-52 (2015)).  Appellate courts in New York State routinely

---

[10]     "Upon motion of the defendant," "the court must declare a mistrial . . . when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives him of a fair trial." N.Y. Crim. Proc. Law § 280.10(1)).

have held that it is not an improvident exercise of a trial court's discretion to deny a defendant's mistrial motion where, as here, the trial court "struck the improper testimony and issued a prompt curative instruction to the jury regarding the testimony." *People v. Baker*, 205 A.D.3d 815, 818-19 (2d Dept. 2022) (collecting cases). Moreover, this is not a situation where the prosecution attempted "to goad the [defendant] into requesting a mistrial." *Robar v. Labuda*, 84 A.D.3d 129, 134 (3d Dept. 2011) (quoting *United States v. Dinitz*, 424 U.S. 600, 611 (1976)). As Ms. Musarra noted during the colloquy, P.O. Mack's mention of the gang issue was not in response to the prosecutor's questioning. (T: 515).

As a mistrial motion under C.P.L. § 280.10(1) had "little or no chance of success," *People v. Caban*, 5 N.Y.3d 143, 152 (2005) (quotation omitted), Ms. Musarra cannot be found ineffective for not making such a motion, *see id*. Likewise, an argument faulting Ms. Musarra for failing to move for a mistrial had no reasonable likelihood of convincing the Appellate Division to reverse Petitioner's conviction on the ground that he received ineffective assistance of counsel. Thus, Ms. Chase was not ineffective in declining to raise this issue on appeal. *See*, *e.g.*, *People v. Crampton*, 201 A.D.3d 1020, 1024 (3d Dept. 2022) ("[C]ounsel cannot be deemed ineffective for failing to pursue a strategy or defense that had little or no chance of success") (collecting cases).

A review of the trial record and Ms. Chase's appellate brief demonstrates that she did not omit any "significant obvious issue[s]," *Lynch*, 789 F.3d at 312. The issues Petitioner claims she should have raised "were clearly and significantly weaker[,]" *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994), and their omission displays reasonable professional judgment on Ms. Chase's part. Furthermore, there is no reasonable possibility

that inclusion of any or all of the claims would have changed the outcome of Petitioner's appeal. Even under a pre-AEDPA standard, Petitioner has not shown that the Appellate Division's denial of his *coram nobis* application reflects an incorrect application of *Strickland*. It follows that the Appellate Division did not unreasonably apply, or rule in a manner contrary to, *Strickland*. Petitioner therefore is not entitled to habeas relief on his claims of ineffective assistance of appellate counsel.

## V.   CONCLUSION

For the reasons discussed above, the request for a writ of habeas corpus is denied and the petition (Dkt. 1) is dismissed. The Court declines to issue a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      January 30, 2023
            Rochester, New York